# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 04-6020SI

_____

| | | |
|---|---|---|
| In re: ACCESSAIR, Inc., | * | |
| | * | |
| Debtor | * | |
| ------------------------ | * | |
| Anita Shodeen, Trustee, | * | |
| | * | |
| Plaintiff-Appellee | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| v. | * | Southern District of Iowa |
| | * | |
| Airline Software, Inc. | * | |
| | * | |
| Defendant-Appellant | * | |

_____

Submitted: August 26, 2004
Filed: September 22, 2004

_____

Before MAHONEY, VENTERS, and McDONALD, Bankruptcy Judges.

McDONALD[1], Bankruptcy Judge

_____

[1] The Honorable David P. McDonald, United States Bankruptcy Judge for the Eastern District of Missouri, sitting by designation.

Airline Software, Inc. ("Airline Software") appeals from the judgment of the bankruptcy court[2] in favor of Anita Shodeen, Trustee, holding that Airline Software failed to meet its burden of proof in demonstrating that the Trustee could not avoid six preferential transfers that Debtor, Access Air, remitted to Airline Software under either the ordinary course or subsequent new value defenses contained in 11 U.S.C. §§ 547(c)(2) and (c)(4). We affirm.

I.

Access Air and Airline Software entered into an agreement in 1997 (the "Software Agreement"), whereby Airline Software agreed to grant Access Air a non-exclusive license to utilize an airline management software package (the "Software") and to install and support the Software. Access Air agreed to remit a down payment and then make monthly payments on the first of each month to Airline Software in exchange for the non-exclusive license and support. The parties amended the Software Agreement in February 1999 to allow Access Air access to the source code for the Software in exchange for an additional $250,000 payment (the "Software Agreement Amendment").

The parties executed another agreement on October 5, 1999 (the "October Agreement"). The October Agreement gave Access Air and its customers the right to access a central reservation system. The October Agreement required Access Air to pay Airline Software $25,000 and to pay Airline Software $1,200 per day for each day Airline Software spent installing the applicable software onto Access Air's computer system. Also, the October Agreement mandated that Access Air pay $12,500 of the contract price prior to Airline Software's installation of the software and hardware and then to make monthly payments on the first of each month. The

---

[2] The Honorable Russell J. Hill, United States Bankruptcy Judge for the Southern District of Iowa.

October Agreement further required Access Air to reimburse Airline Software's employees for their actual expenses incurred while installing and configuring the applicable hardware and software.

Access Air remitted six payments (the "Preference Payments") to Airline Software totaling $103,006.75 during the preference period, which began on August 31, 1999. Access Air remitted all six of the Preference Payments to Airline Software under either the Software Agreement or the Software Agreement Amendment.

Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code on November 29, 1999. The bankruptcy court later converted the case to a proceeding under Chapter 7 on the motion of the United States Trustee. The Trustee then filed a preference action under 11 U.S.C. § 547(b) against Airline Software seeking to avoid the Preference Payments. The Trustee also sought to recover the Preference Payments from Airline Software under § 550(a)(1).

Airline Software asserted that the Trustee could not avoid the Preference Payments for two reasons. First, Airline Software contended that the Trustee could not avoid the Preference Payments because Access Air made them in the ordinary course under § 547(c)(2). Second, Airline Software argued that the Trustee could not avoid the Preference Payments under § 547(c)(4) because it provided new value to Access Air subsequent to receiving some of the Preference Payments when it provided the services to Access Air pursuant to the October Agreement.

Prior to trial, the parties stipulated that the Preference Payments were preferential under § 547(b). Thus, the only issues tried were whether Access Air remitted the Preference Payments in the ordinary course and whether Airline Software provided new value to Access Air subsequent to receiving at least some of the Preference Payments.

Because the parties stipulated that the Preference Payments were preferential under § 547(b), the Trustee did not produce evidence at trial. Airline Software produced the testimony of its president, Gorden Rosen, and Access Air's director of management information systems, Jan Burroughs, to support its affirmative defenses. Airline Software also introduced a ledger of Access Air's payments to it as well as copies of some of Access Air's checks and wire transfers.

Rosen testified that Access Air failed to timely remit the monthly payments from the beginning of the parties' relationship, although Access Air's tardiness became worse over time. Rosen also remarked that he did speak with officers at Access Air concerning Access Air's failure to remit timely monthly payments during the course of the parties' relationship. Both Rosen and Burroughs stated that Rosen notified Access Air in August 1999 that if it did not make payments to Airline Software, Airline Software would stop providing support for the Software. Rosen and Burroughs both opined that Access Air could not operate its business without Airline Software supporting the Software.

Burroughs stated that after Rosen had demanded Access Air's payment by wire transfer in August 1999, she contacted Nick Miller, apparently an employee in Access Air's accounting department, to negotiate a payment plan with Airline Software. Burroughs stated that Access Air remitted its two largest payments at the onset of the preference period, totaling approximately $75,000, to Airline Software shortly after the exchange among herself, Rosen and Miller. Burroughs remarked that Access Air's payment pattern to Airline Software just prior to and during the preference period was similar to its payment pattern to other vendors.

Rosen testified that Airline Software transmitted all of its accounting records to a company called Giro, located in Tulsa, Oklahoma, pursuant to Giro's prospective purchase of the Software from Airline Software. Giro apparently experienced financial difficulty shortly after Airline Software provided it with the records and it

never purchased the Software. Rosen stated that Giro destroyed the records sometime in March, 2000 and that Airline Software failed to make any copies of the records. Therefore, although Airline Software did produce at trial the dates of Access Airline's payments to it, Rosen could not match those payments to any particular invoice.

Rosen also testified concerning Airline Software's experience with two other regional air carriers similar to Access Air, Midway Airline and Presidential. Rosen noted that the payment history of Midway and Presidential were generally similar to Access Air's payment history. Rosen, however, could not testify as to the specific payment history of either Midway or Presidential or to Access Air because Airline Software no longer possessed its accounting records.

Finally, Rosen testified that he did install the reservation software on Access Air's computer system sometime in October 1999 pursuant to the October Agreement. Rosen, however, stated that Access Air did not remit the $12,500 to Airline Software prior to installation as required by the October Agreement. And Rosen noted that it was Airline Software's general policy not to provide services until the customer actually made the down payment. Rosen further testified that there is no record of Airline Software receiving the $1,200 *per diem* payment from Access Air for its installation of the software as required under the October Agreement. Rosen additionally conceded that he had no record of anyone at Airline Software submitting an expense report to Airline Software for reimbursement as called for in the October Agreement.

The bankruptcy court entered judgment in favor of Trustee. The bankruptcy court specifically found that it did not find Rosen's testimony to be credible. Also, the bankruptcy court noted that apart from Rosen's testimony, Airline Software had failed to demonstrate the nature of the parties' relationship prior to the preference period. The bankruptcy court additionally found the scant documentary evidence in the record demonstrated that Access Air's payment to Airline Software was

substantially more delinquent in the preference period (93 days from invoice) versus the pre-preference period (23.5 days from invoice). Further, the bankruptcy court observed that both Rosen and Burroughs testified that Airline Software applied pressure to Access Air to remit payment and that Access Air did make two unusually large payments during the preference period to Airline Software in response to that pressure. Based on this record, the bankruptcy court found that Airline Software failed to meet its burden of proof in demonstrating that Access Air's payment of the Preference Payments was subjectively ordinary under § 547(c)(2)(B).

The bankruptcy court also found that Airline Software failed to demonstrate that the preferential transfers were objectively ordinary as required by § 547(c)(2)(C). The bankruptcy court premised this ruling on its finding that Airline Software failed to produce any credible evidence of the prevailing terms in the relevant industry. Therefore, the bankruptcy court held that Airline Software failed to establish that the preferential transfers were objectively ordinary under § 547(c)(2)(C).

Finally, the bankruptcy court held Airline Software failed to establish that it provided new value to Access Air subsequent to receiving some of the Preference Payments. The Court held that although the evidence indicated that the parties did in fact execute the October Agreement, there was no credible evidence that Airline Software actually provided the software services described in the October Agreement.

Airline Software appeals from the judgment of the bankruptcy court arguing that based on the evidence produced at trial, the bankruptcy court's finding that Airline Software failed to meet its burden of proof under both §§ 547(c)(2) and (c)(4) was erroneous. We affirm.

## II.

We will not set aside the bankruptcy court's findings of fact unless those findings are clearly erroneous. Fed. R. Bankr. P. 8013. A finding is clearly erroneous if, after examining the entire record, we are left with a definite and firm conviction that the bankruptcy court has made a mistake. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). Also, when reviewing the evidentiary record, we will give due deference to the bankruptcy court's opportunity to judge the credibility of witnesses. Fed. R. Bankr. P. 8013. We will review the bankruptcy court's determination of questions of law on a *de novo* basis. Holliday v. Kline (In re Kline), 65 F.3d 749, 750 (8th Cir. 1995).

Here, Airline Software is challenging the bankruptcy court's determination that Airline Software failed to produce sufficient evidence to meet its burden of proof in establishing its affirmative defenses. An attack on the sufficiency of the evidence to sustain the bankruptcy court's judgment is a challenge to the factual findings of the bankruptcy court. Sholdan v. Dietz (In re Sholdan), 217 F.3d 1006, 1010 (8th Cir. 2000). Accordingly, we will review the bankruptcy court's judgment under a clearly erroneous standard. Id.

## III.

*A. Introduction.*

Airline Software, as the transferee of the Preference Payments, has the burden of establishing its ordinary course and subsequent new value defenses by a preponderance of the evidence. 11 U.S.C. § 547(g); Official Plan Comm. v. GE Capital, Corp. (In re Omniplex Communications Corp.), 297 B.R. 573, 576 (Bankr. E.D. Mo. 2003). Thus, because it bore the burden of proof on its affirmative defenses, Airline Software also had the burden of establishing a sufficient evidentiary

record to support its affirmative defenses. <u>Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.)</u>, 228 B.R. 225, 235 n. 17 (Bankr. D. Minn. 1998).

*B. The Ordinary Course Defense.*

*1. Introduction*

Airline Software first argues that the bankruptcy court erred in finding that it failed to establish that Access Air remitted the Preference Payments to it in the ordinary course under § 547(c)(2). Section 547(c)(2) requires that the transferee establish that the transfer in question was both subjectively and objectively ordinary. <u>Jones v. United Sav. & Loan Assoc. (In re U.S.A. Inns of Eureka Springs of Arkansas)</u>, 9 F.3d 680, 683 (8th Cir. 1993). Section 547(c)(2)(B) requires the transferee to demonstrate that the transfer was subjectively ordinary in that the debtor made the transfer in the ordinary course of the business or financial affairs of the debtor and the transferee. <u>Id</u>. The transferee must also establish under § 547(c)(2)(C) that the transfer was objectively ordinary in that the debtor made the transfer according to ordinary business terms. <u>Id</u>.

The bankruptcy court found Airline Software failed to produce sufficient credible evidence to establish either the subjective or objective prong of the ordinary course defense. After reviewing the evidentiary record, we find that the bankruptcy court did not clearly err in making that finding.

*2. The bankruptcy court was free to find Rosen's testimony not to be credible.*

As an initial matter, the bankruptcy court noted that Airline Software relied heavily upon the testimony of Rosen in attempting to establish that the Preference Payments were both subjectively and objectively ordinary. And the bankruptcy court explicitly found that Rosen's testimony was not credible. Airline Software argues

that the basis on which the bankruptcy court found Rosen's testimony lacked credibility was not proper. We disagree.

The bankruptcy court specifically found that Rosen was not credible because he testified that the reason he did not produce Airline Software's records upon the Trustee's request for production was because he had shipped them to Giro, which destroyed them. The court stated it was highly skeptical of Rosen's proffered reason for not producing the records because an experienced business person such as Rosen would have made a copy of those records before shipping them.

Airline Software argues that because the Trustee did not file a motion for sanctions for Airline Software's failure to produce the documents, the court improperly disregarded Rosen's testimony. The court, however, was not sanctioning Airline Software for a discovery violation but was merely observing that it believed Rosen was probably lying. This determination is clearly within the bankruptcy court's purview of judging the credibility of a witness, which we must give significant weight under Rule 8013. Johnson v. Fors (In re Fors), 259 B.R. 131, 140 (B.A.P. 8th Cir. 2001).

*3. The bankruptcy court's finding that the Preference Payments were not subjectively ordinary was not clearly erroneous.*

The overriding factor as to whether the transfers in question were subjectively ordinary under § 547(c)(2)(B) is whether there is some consistency between the payments debtor made to the transferee prior to the preference period and the preference payments. Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497-98 (8th Cir. 1991). Airline Software argues that it did produce sufficient evidence that established that Access Air's payments to it during the preference period were consistent with the parties' prior course of dealing because it demonstrated that Access Air paid it late in both the pre-preference and preference period. Clearly, a

late payment in the preference period may be subjectively ordinary if the debtor also paid late in the pre-preference period. Id. at 498. A tardy preference payment, however, is not subjectively ordinary if it is substantially more tardy than the debtor's late payments during the pre-preference period. Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.), 153 F.3d 915, 918 (8th Cir. 1998).

Here, the documentary evidentiary produced at trial indicated that Access Air's tardiness of payments during the preference period increased by 294% as compared to the pre-preference period. Thus, although it appears that Access Air's pattern was to pay late both in the pre-preference and preference period, the record demonstrates that the tardiness of its payments become substantially more significant during the preference period. Accordingly, the bankruptcy court's finding that the Preference Payments were not subjectively ordinary is not clearly erroneous.

Airline Software also assails the bankruptcy court's judgment because the bankruptcy court in its analysis omitted several payments that Access Air made to it. It is true that there are payments that the bankruptcy court did not include in its analysis. A review of the evidentiary record, however, indicates that Airline Software failed to provide the invoice or the date of the invoice corresponding to those payments. Rather, Airline Software simply provided the bankruptcy court with the date of each payment.

Because Airline Software bears the burden of proof on its ordinary course defense, it had the burden of establishing some baseline of dealings between the parties prior to the preference period to enable the bankruptcy court to compare Access Air's payment practice in the preference period with its prior payment practices. Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999). Airline Software's mere provision of the dates of Access Air's payments to it does not even remotely establish such a baseline of dealings between the parties.

The bankruptcy court also found that Airline Software failed to establish that the Preference Payments were subjectively ordinary because Access Air made at least two of the payments in response to Rosen's threat in August 1999 to stop supporting the Software. Any payment that the debtor makes to the creditor in response to the creditor's unusual collection efforts is not subjectively ordinary for purposes of § 547(c)(2)(B). Cent. Hardware Co. v. The Walker-Williams Lumber Co. (In re Spirit Holding Co., Inc.), 214 B.R. 891, 898 (E.D. Mo. 1997) aff'd. 153 F.3d 902 (8th Cir. 1998). Airline Software argues that the bankruptcy court erred in making this conclusion because there is no evidence that Access Air actually remitted any of the Preference Payments because of Rosen's threat. We disagree with Access Air's assessment of the record.

Both Burroughs and Rosen testified that Rosen demanded payment from Access Air in August 1999 and threatened that he would stop supporting the Software if Access Air failed to make a payment.[3] And Burroughs testified that Rosen become more insistent that Access Air make payment in August 1999. Further, both Burroughs and Rosen noted that Access Air absolutely required Airline Software's support of the Software to continue its operation. Also, Burroughs testified that in response to Rosen's threat she contacted Miller to negotiate a payment plan and that Access Air remitted two of the Preference Payments following such negotiations. This record amply supports the bankruptcy court's finding that Access Air made at

---

[3] Airline Software also contends that the bankruptcy court was not free to disbelieve Rosen's testimony with respect to whether the Preference Payments were made in the ordinary course of business but believe Rosen's testimony that he did demand payment from Access Air in August 1999. Burroughs' testimony, however, by itself supports the bankruptcy's court finding. Also, the bankruptcy court as a finder of fact is free to find portions of a witness' testimony credible while finding other portions non-credible. Allen v. Chicago Transit Authority, 317 F.3d 696, 703 (7th Cir. 2003).

least the first two Preference Payments in response to Rosen's heightened collection efforts.

After reviewing this record, we are not left with a definite and firm belief that the bankruptcy court erred in finding that Airline Software failed to establish by a preponderance of the evidence that Access Air's payment of the Preference Payments was subjectively ordinary under § 547(c)(2)(B). Accordingly, the trial court's finding that Airline Software failed to carry its burden of proof under § 547(c)(2)(B) is not clearly erroneous.

*4. The bankruptcy court's finding that the Preference Payments were not objectively ordinary is not clearly erroneous.*

Section 547(c)(2)(C) requires the transferee to demonstrate that the debtor made the preferential transfer according to the ordinary business terms prevailing within the debtor's industry. Jones v. United Sav. & Loan Assoc. (In re U.S.A. Inns), 9 F.3d 680, 684 (8th Cir. 1993). Thus, to meets its burden under § 547(c)(2)(C), the transferee must produce objective evidence of the range of prevailing practices utilized within the debtor's industry involving transactions similar to the transfer in question and that the transfer fits into that range. Id.

The Bankruptcy Court found that Airline Software failed to meet its burden under § 547(c)(2)(C) because it failed to produce objective evidence of the general range of terms prevailing within the industry. Airline Software argues that the bankruptcy court's finding is erroneous because the testimony of Burroughs and Rosen established the prevailing industry standards as a matter of law. We disagree.

It is certainly true that an employee of the transferee can establish the prevailing industry standards based on that employee's personal knowledge of those standards. In re U.S.A. Inns, 9 F.3d at 685-686. Here, however, as illustrated above,

-12-

the bankruptcy court acted well within its very wide discretion under Rule 8013 in not finding Rosen's testimony to be credible on this issue.

Also, even if the bankruptcy court were inclined to find Rosen's testimony to be credible on this issue, Rosen's testimony is not objective evidence of industry standards. Rosen only testified that Airline Software's experience with the payment patterns of two other regional air carriers was generally similar to its experience with Access Air. Thus, Rosen's testimony, even if credible, failed to establish even the broadest range of practices within Access Air's industry. Further, Rosen's testimony only covers Airline Software's own subjective experience, which is insufficient by itself to establish the range of terms prevailing within the industry as required by § 547(c)(2)(C). In re Midway Airlines, 69 F.3d 792, 797-98 (7th Cir. 1995); Lawson v. Ford Motor Co. (In re Roblin Industr., Inc.), 78 F.3d 30, 43 (2d Cir. 1996).

Concerning Burroughs' testimony, she only testified that Access Air's payment history to Airline Software was similar to its payment history to other vendors just prior to and during the preference period. As with the creditor's subjective experiences with its other customers, the debtor's subjective payment history to its other creditors is not objective evidence of the range of terms prevailing within the relevant industry as required by § 547(c)(2)(C). Gulf City Seafoods v. Ludwig Shrimp Co, Inc. (In re Gulf City Seafoods), 296 F.3d 363, 368 (5th Cir. 2002); Peltz v. Gulfcoast Workstation Group (In re Bridge Info. Sys.), 311 B.R. 774, 780 (Bankr. E.D. Mo. 2004); Seaver v. Allstate Sales & Leasing Corp. (In re Sibilrud), 308 B.R. 388, 398 (Bankr. D. Minn. 2004). Rather, the transferee must establish the general range of industry practice by introducing objective evidence outside it or the debtor's subjective experience to satisfy its burden of proof under § 547(c)(2)(C). In re U.S.A. Inns, 9 F.3d at 684. Airline Software failed to produce such evidence here.

After reviewing this record, we are not left with a definite and firm conviction that the bankruptcy court made a mistake in finding that Airline Software failed to

establish that Access Air made the Preference Payments to it according to ordinary business terms. Therefore, the bankruptcy court's finding that Airline Software failed to carry its burden of proof under § 547(c)(2)(C) is not clearly erroneous.

*C. The Subsequent New Value Defense.*

Airline Software also contends that the bankruptcy court erred in finding that it did not provide subsequent new value to Access Air after receiving at least some of the Preference Payments. We disagree.

Section 547(c)(4) states that a trustee may not avoid a preferential transfer to the extent that the transferee, after receiving the preferential transfer, extends new value to the debtor on an unsecured basis and that the new value remains unpaid. As with the ordinary course defense discussed above, because the subsequent new value defense contained in § 547(c)(4) is an affirmative defense to a preference action, the transferee has the burden of proof and production. Kroh Bros. Dev. Co. v. Continental Constr. Eng'r. (In re Kroh Bros.), 930 F.2d 648, 652 (8th Cir. 1991). Specifically, in order to prevail on a subsequent new value defense under § 547(c)(4), the creditor must establish that: (1) the creditor received a transfer that is otherwise avoidable as a preference under § 547(b); (2) after receiving the preferential transfer, the creditor advanced new value to the debtor on an unsecured basis; and (3) the debtor did compensate the creditor with an "otherwise unavoidable" transfer for the new value as of the petition date. Id.

Here, the bankruptcy court found that Airline Software failed to establish that it extended new value to Access Air after it had received at least some of the Preference Payments. Airline Software maintains that this finding is incorrect because the record demonstrates that it did provide new value to Access Air when it installed the software and hardware with respect to the October Agreement.

The record, however, indicates that Access Air never remitted the $12,500 down payment to Airline Software. And Rosen testified that it was Airline Software's general practice not to provide the services contained in a contract until the client remitted the down payment. Further, there is no evidence in the record that Access Air ever remitted the $1,200 *per diem* or that any employee of Airline Software ever submitted an expense report to Access Air.

The only evidence in the record that supports Airline Software's contention that it did provide services under the October Agreement is Rosen's testimony. The bankruptcy court, however, as we have noted above, acted within its broad discretion under Rule 8013 in not finding Rosen's testimony to be credible.

Airline Software also points to a $5,000 payment that Access Air made to it during the preference period in support of its argument that it did provide Access Air with some service under the October Agreement. Airline Software posits that because the Trustee did not seek to avoid this payment as preferential under § 547(b), the payment must have been the down payment on the October Agreement.

The October Agreement, however, required Access Air to remit a down payment of $12,500. Also, Airline Software had the burden of producing some evidence linking the $5,000 payment to the October Agreement rather than asking the bankruptcy court to make a supposition that the $5,000 payment somehow related to the October Agreement. Furthermore, even if we were to find that the $5,000 payment was possibly some evidence that Airline Software did provide service to Access Air under the October Agreement, we will not substitute our interpretation of the record for the bankruptcy court's interpretation under the clearly erroneous standard. <u>Wealder Oil & Gas, Inc. v. Southwestern Glass Co., Inc. (In re Southwestern Glass Co., Inc.)</u>, 332 F.3d 513, 517 (8th Cir. 2003).

After reviewing the record, we are not left with a definite and firm conviction that the bankruptcy court made a mistake in finding that Airline Software failed to establish by a preponderance of the evidence that it provided new value to Access Air. Accordingly, the bankruptcy court's finding that Airline Software failed to establish that the Trustee could not avoid the Preference Payments under § 547(c)(4) is not clearly erroneous.

IV.

The rather thin documentary evidence Airline Software supplied to the bankruptcy court demonstrates that Access Air's tardiness in its payments to Airline Software increased significantly during the preference period. Further, with respect to several payments that the bankruptcy court did not include in its analysis, Airline Software failed to produce evidence as to what invoice corresponded to those payments. Also, the record supports the bankruptcy court's conclusion that Access Air remitted the two largest Preference Payments in response to Airline Software's intensified collection efforts. Finally, Airline Software failed to produce sufficient evidence of the prevailing standards within the relevant industry. Accordingly, the bankruptcy court's finding that Airline Software failed to establish by a preponderance of the evidence that Access Air remitted the Preference Payments in the ordinary course under § 547(c)(2) is not clearly erroneous.

The record also indicates that Access Air never made the $12,500 down payment to Airline Software as required by the October Agreement and that it was Airline Software's general policy not to provide the service until the customer remitted the down payment. Also, there is no evidence that any employee of Airline Software requested reimbursement from Access Air for any expenses incurred while installing the software as called for in the October Agreement. Finally, Access Air did not tender the $1,200 *per diem* to Airline Software as required by the October Agreement. Therefore, the bankruptcy court's finding that Airline Software failed to

establish by a preponderance of the evidence that it provided new value to Access Air is not clearly erroneous.

Therefore, we affirm the judgment of the bankruptcy court.

───────────────────────────